UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X
                                :
UNITED STATES OF AMERICA,        :    07-CR-99 (BMC)
                                :
              v.                 :    June 4, 2007
                                :    Brooklyn, New York
FRANK NAGI,                      :
                                :
              Defendant.         :
--------------------------------X


TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPLICATION
BEFORE THE HONORABLE JAMES ORENSTEIN
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:         UNITED STATES ATTORNEYS OFFICE
                            BY:  BONNIE KLAPPER, ESQ.
                            Assistant United States Attorney
                            610 Federal Plaza
                            Central Islip, New York  11722


For the Defendant:          ALAN SEIDLER, ESQ.



Court Transcriber:          CARLA NUTTER
                            TypeWrite Word Processing Service
                            356 Eltingville Boulevard
                            Staten Island, New York 10312







Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

1            THE CLERK:  Criminal Cause for Bail Application, 07-

2   CR-99, USA v. Frank Nagi.  Counsel, please state your names for

3   the record.

4            MS. KLAPPER:  Good afternoon, Your Honor.

5            Bonnie Klapper for the United States.

6            THE COURT:  Good afternoon.

7            MR. SEIDLER:  Good afternoon.

8            Alan Seidler for Mr. Nagi, who is present, Your

9   Honor.

10            THE COURT:  Good afternoon.  Good afternoon, Mr.

11   Nagi.

12            THE DEFENDANT:  Good afternoon.

13            THE COURT:  All right.  We're here for a bail

14   application; is that correct?

15            MR. SEIDLER:  Yes, Your Honor.

16            THE COURT:  All right.  Mr. Seidler.

17            MS. KLAPPER:  Your Honor, before we proceed might I

18   inquire if you've had the opportunity to review the two prior

19   rulings in which the magistrate deferred this [sic] --?

20            THE COURT:  I don't know.

21            MS. KLAPPER:  Were you aware that --

22            THE COURT:  I was not.  I was told you were on for a

23   bail application for today.  Is this a contested --

24            MS. KLAPPER:  It is, Your Honor.

25            THE COURT:  No, before -- the previous rulings?

1        MS. KLAPPER:  I believe there were two, possibly

2  three, but at least two prior bail applications in this case;

3  one is the date of Mr. Nagi's arrest and one subsequent one.

4        THE COURT:  Okay.  But were they contested or was it

5  a --

6        MS. KLAPPER:  Contested, Your Honor.

7        THE COURT:  Okay.

8        MR. SEIDLER:  It was contested.

9        THE COURT:  All right.

10        MR. SEIDLER:  On April 20th Judge Azrack denied a

11  $100,000.00 personal recognizance bond and we proposed in

12  addition to Mr. Nagi three co-signors.  Since that time I have

13  additions to the package.  I am seeking to renew the bail

14  application.

15        THE COURT:  Okay.  What was the most recent

16  application that was denied?

17        MR. SEIDLER:  A $100,000.00 personal recognizance

18  bond by Mr. Nagi, co-signed by Maria Adamas, who made

19  $30,279.00 a year; Julio Adamas, who made $20,800.00 a year and

20  Santo Pinales, who made $25,669.00 per year.

21        THE COURT:  And what is new in today's application?

22        MR. SEIDLER:  There is a property, Your Honor, which

23  has an equity in the amount of $126,396.00, there's $15,000.00

24  in cash, I have four additional proposed co-signatories;

25  there's Yoheles [Ph.] Perrera, who owns the property, Cesar

4

1    Azuna, who is a custodian at Columbia and makes $39,000.00,

2    there's Vincent Mateus, who makes $40,185.00, there's Osha

3    Maloney, who makes $25,000.00.  She lives in Redding,

4    Pennsylvania.

5              THE COURT:  Now, the --

6              MR. SEIDLER:  And --

7              THE COURT:  Go ahead.

8              MR. SEIDLER:  -- Alexander Cruz, who makes $24,000.00

9    a year.

10             THE COURT:  All right.  How are these people all

11   connected to your client?

12             MR. SEIDLER:  Friends and -- friends.

13             THE COURT:  All right.  Ms. Klapper.

14             MS. KLAPPER:  Yes, Your Honor.

15             THE COURT:  I'm sorry, you --

16             MR. SEIDLER:  Well, I just wanted to address the case

17   a little bit if I could before we got into it.

18             Your Honor, Mr. Nagi was heard on the telephone

19   talking to Mr. Yepes-Casas, who is the lead defendant.  Based

20   on those conversations the government has interpreted those

21   conversations to be coded conversations involving narcotics.

22   In fact -- and I have documentation for all of this -- Mr. Nagi

23   purchased a delicatessen from Mr. Yepes-Casas along with four

24   other people in a corporate format.  He purchased a BMW X5 used

25   car from Mr. Yepes-Casas.  There were three checks seized by

5

1   the government -- no narcotics -- but three checks seized by

2   the government made out to Mr. Yepes-Casas signed by Mr. Nagi

3   which bounced; one for $420.00 and two for $500.00.

4          THE COURT:  Say that last piece again.  Who had the

5   bounced checks?

6          MR. SEIDLER:  They came back to Mr. Nagi.  He had the

7   bounced checks.  He was the payee.  The payor was Mr. Yepes-

8   Casas and these were commercial transactions.

9          THE COURT:  All right.  But he bought the BMW and the

10   deli?

11          MR. SEIDLER:  He bought the BMW and he bought the

12   deli at 529 West 179th Street.  It's called The Finest Deli.

13   He bought those from Mr. Yepes-Casas.

14          THE COURT:  What does he do?  Did he have the assets

15   to buy those -- the property of the car?

16          MR. SEIDLER:  He owns delicatessens.

17          THE COURT:  He now owns a delicatessen.

18          MR. SEIDLER:  He owns delicatessens but this

19   particular delicatessen he bought from Mr. Yepes-Casas as well.

20          THE COURT:  But he bought -- in other words, before

21   he bought it he owned other delicatessens?

22          MR. SEIDLER:  Yes.

23          THE COURT:  With what kind of income?

24          MS. KLAPPER:  The Pretrial Services report indicates

25   that he was a deli manager, Your Honor.

6

1          THE COURT:  Yes.

2          MR. SEIDLER:  About $24,000.00.

3          THE COURT:  A year?

4          MR. SEIDLER:  Yes.  The transaction involving the

5  purchase of the delicatessen was done through a corporation

6  with a total of four partners and there were notes given.  He

7  was the one who was talking to Yepes-Casas because of all the

8  partners he was the only one who spoke Spanish.

9          In addition to that we have an affidavit which Mr.

10  Yepes-Casas gave to Mr. Nagi which I handed up basically saying

11  that Yepes-Casas had no criminal dealings with Mr. Nagi.  If

12  you go to the affidavit in support of the search warrant the

13  government is just --

14          THE COURT:  Excuse me one moment.

15          This affidavit is dated April 8, 2007?

16          MR. SEIDLER:  Yes, Your Honor.

17          THE COURT:  I take it that's after the charges were

18  instituted in this case?

19          MR. SEIDLER:  Correct.

20          THE COURT:  And after Mr. Yepes-Casas had counsel?

21          MR. SEIDLER:  Yes.

22          MS. KLAPPER:  Counsel was unaware of the affidavit.

23          MR. SEIDLER:  Well, that may be but he gave it to the

24  defendant and if he gave it to the -- this had nothing to do

25  with me.  All right?  He gave this to Mr. Nagi and because he

7

1    gave it to Mr. Nagi I think I'm free to use it however I want.

2    However --

3            THE COURT:  Well, has counsel for Mr. Yepes-Casas

4    seen this and advised as to whether his client actually adheres

5    to what it says?

6            MR. SEIDLER:  No.  He said that he's seen it and that

7    Mr. Nagi, including me, are going to have no further contact

8    with Mr. Yepes-Casas.  I've never had contact with Mr. Yepes-

9    Casas.

10           THE COURT:  No, I'm not suggesting you tried to --

11           MR. SEIDLER:  No, no -- well, I received a letter.

12           THE COURT:  Does the letter confirm or deny what's in

13   the affidavit?

14           MR. SEIDLER:  The letter does not confirm or deny the

15   contents of the affidavit.  It just affirms that the affidavit

16   was made.

17           THE COURT:  Well, before -- I don't know if you want

18   me to hold off and rule on this until we can determine it but

19   if I'm going to rely on this at all I want to hear from Mr.

20   Yepes-Casas' attorney to know if his client adheres to what's

21   in there.

22           MR. SEIDLER:  Okay.  Another thing --

23           THE COURT:  You might want to hold on to this.

24           MR. SEIDLER:  Your Honor, going through the search

25   warrant affidavit, the government just has it wrong.  They have

1  Mr. Nagi being the owner of Premises 4, which is at 280

2  Audobon, The Canuco Grocery Store?  That has nothing to do with

3  him.  He owns the grocery store at 179th Street, nothing to do

4  with the Canuco Grocery Store.

5       In Paragraph 32 they have Yepes-Casas leaving money

6  for Nagi at the deli for a narcotics transaction according to

7  the government when in point of fact Nagi at all times is

8  supposed to be the buyer, not the seller, so there is no reason

9  why they would be leaving -- that Yepes-Casas would be leaving

10 that money.

11      THE COURT:  Just tell me -- put this in the proper

12 context.

13      How much if any of these arguments did you make to

14 Judges who previously ruled on your application?

15      MR. SEIDLER:  The only argument I made was concerning

16 the Yepes-Casas affidavit.

17      MS. KLAPPER:  That's not correct, Your Honor.

18      Defense counsel is offering additional surety but in

19 terms of the arguments regarding the strength of the case, Mr.

20 Seidler did argue that the case was based on incorrect

21 information.  We did argue -- I mean I'm surprised Mr. Seidler

22 doesn't recall this but --

23      MR. SEIDLER:  Well, can I finish and perhaps -- I

24 mean just let me finish.

25      THE COURT:  Well, there was a factual inquiry and --

9

1  okay --

2          MR. SEIDLER:  They can say what they want to say.

3          THE COURT:  Excuse me.  One at a time.

4          You say you didn't make these arguments --

5          MR. SEIDLER:  I didn't know about this conversation -

6  -

7          THE COURT:  Excuse me.  Let me -- Mr. Seidler!  It

8  will help if you let me finish the question so that you know

9  what it is I'm asking and then you can respond appropriately.

10  Okay?

11          MR. SEIDLER:  Yes.  Yes.

12          THE COURT:  You say you didn't make these arguments

13  to any previous Judge; is that correct?

14          MR. SEIDLER:  About the affidavit, correct.

15          THE COURT:  No, no, about the weakness of the case,

16  that it's based on error.

17          MR. SEIDLER:  Well, I said that Yepes-Casas had

18  signed an affidavit.  I didn't say that he denied --

19          THE COURT:  You've just made some arguments to me

20  based on --

21          MR. SEIDLER:  The affidavit.

22          THE COURT:  Based -- again, it will help if you allow

23  me to finish the question so that you know what it is I'm

24  asking.

25          THE COURT:  You've been making some arguments based

1  on what you say are incorrect things in the search warrant

2  affidavit; correct?

3          MR. SEIDLER:  Correct.

4          THE COURT:  Did you make those arguments previously?

5          MR. SEIDLER:  No.

6          THE COURT:  Okay.  That's all I want to know and you

7  said he did?

8          MR. SEIDLER:  I did point out to Judge Azrack that

9  there were legitimate business dealings between this defendant

10 and Yepes-Casas.  I mentioned the delicatessen and I mentioned

11 the BMW car which was about to be purchased.

12         The affidavit, I said nothing about.  As a matter of

13 fact after the court appearance I contacted Ms. Klapper and she

14 furnished me a copy of the affidavit.

15         THE COURT:  Okay.  Well, look, to the extent there's

16 -- it's a dispute whether these arguments were raised or not.

17 I'll wait until I've heard all the arguments today but if

18 that's going to make a difference to me I'll get a copy of the

19 recording and listen to it.

20         MR. SEIDLER:  In any event, my point is this --

21 hopefully, I can state it clearly -- this is a case it seems to

22 me where even assuming the government's version his involvement

23 would be slight.  Looking at the total picture I would submit

24 that the government has it wrong; that these coded

25 conversations were not code for narcotics.

1          Be that as it may, I think that he has a significant
2    bail package to be put up.  I've discussed with Mr. Nagi that
3    he doesn't have people who make $100,000.00, concededly, or
4    even close to that.  But he has seven people who are willing to
5    come forward to help him, several of which make close to
6    $40,000.00.  There's a property with significant equity and
7    there's cash and it just seems to me that he should not be in
8    jail while all these issues are being litigated particularly
9    when some people haven't even been extradited yet in the case.
10          So I'm asking Your Honor to permit a bail package
11   involving the cash, the property, the seven co-signors and --
12   so that we can fight this case while he's outside.
13          THE COURT:  All right.  Well, whether he's inside or
14   outside you an fight the case, certainly.
15          Let me ask you, at the time of the initial Pretrial
16   Services report it was noted that he has two passports; one of
17   which was seized -- the Yemenese [sic] passport was seized by
18   the agents, the other one was not.  The location was not known.
19          Have you since located the United States passport?
20          MR. SEIDLER:  Yes.  Yes.
21          THE COURT:  Has it been surrendered?
22          MR. SEIDLER:  No, it has not been surrendered but I
23   will surrender it.
24          THE COURT:  All right.  Ms. Klapper.
25          MS. KLAPPER:  Yes, Your Honor.

1          I'll begin by stating that this is a presumption case

2    involving a large quantity of heroin.  Mr. Nagi was arrested as

3    a result of an approximately eight month wire tap

4    investigation.  He was intercepted somewhere between twelve and

5    fifteen times and he was surveilled approximately five times.

6          The investigation commenced when a confidential

7    informant came to the government and informed us that Frank

8    Nagi, who he knew as Frank the Arab, was involved in heroin

9    trafficking with defendant Hector Vidal Yepes-Casas.  That

10   informant's information was verified in that he provided the

11   government throughout the course of the investigation with the

12   Yepes-Casas telephone numbers.  So the government does consider

13   him a reliable informant.

14         Defense counsel's argument, I believe, if I have it

15   correct is that the intercepted conversation relates strictly

16   to legitimate business transactions and that the government has

17   misconstrued the nature of those conversations.  Without going

18   through all of the evidence, Your Honor, the coded [sic]

19   conversation in the transcripts which I have reviewed do

20   indicate that they do not relate to financial transactions,

21   they relate in our opinion to the heroin transactions.

22         THE COURT:  Do you have copies for me or something

23   that I can read now?

24         MS. KLAPPER:  I had, Your Honor -- at the last bail

25   hearing I referenced particular conversations and read them

1  into the record.  I don't have those conversations now.

2          THE COURT:  Well, get them and bring them back then

3  or do you want to read them into the record?

4          MS. KLAPPER:  I can do that but I think if I continue

5  I may not need to but --

6          THE COURT:  I doubt that but go ahead.

7          MS. KLAPPER:  Let me continue and then I can go back

8  to the office and get copies of the transactions.

9          Your Honor, the defendant as you may know has a prior

10  conviction.  In 2003, he's arrested and convicted and spent

11  eighteen months in custody for possession of contraband

12  cigarettes.  In 2003, he was also arrested for possessing

13  checks which had been stolen from the mails; stolen social

14  security checks, stolen teller checks.

15          THE COURT:  Well, that latter charge, I take it, I

16  can't rely on anything --

17          MS. KLAPPER:  Yes, but if I may continue?

18          The affidavit in support of that complaint detailed

19  how the defendant was charged with stealing social security

20  checks, stealing checks from the mail and possessing checks in

21  the names of other individuals.

22          According to the case agent the U.S. Attorney's

23  Office dismissed the complaint.  On the date of his arrest in

24  this case in February 2007 the government found multiple checks

25  made out in the names of other individuals -- social security

1  checks, tellers checks -- the same kind of checks that Mr. Nagi

2  had in his possession when he was arrested in 2003.  When

3  questioned about those checks initially he stated, they're not

4  mine, I don't know how they got there.  As the agents were

5  taking him out of the apartment or wherever they arrested him,

6  I don't recall exactly, he stated, "and anyway, I didn't try to

7  cash them."

8          So I'm working with the Secret Service now and we've

9  confirmed that all of those checks were stolen from the mail.

10 We've interviewed the owners of those checks and they all state

11 that they don't know Mr. Nagi and they didn't give Mr. Nagi

12 permission to have those checks.

13         THE COURT:  And where were these checks now?

14         MS. KLAPPER:  I believe on his kitchen table, Your

15 Honor.

16         THE COURT:  Okay.

17         MS. KLAPPER:  Certainly in his apartment, maybe not

18 on the kitchen table, maybe in the bedroom but in his

19 apartment.

20         So you have a presumption case.  The case guideline-

21 wise is a ten years to life case.  We have intercepted

22 conversations and in one particular intercepted conversation,

23 Your Honor, we have a statement that Mr. Casas is going to be

24 dropping something off for Mr. Nagi and we surveil him to the

25 delicatessen and surveil him picking something up.  We have the

1  fact that he appears to be engaged in additional criminal

2  conduct meaning the counterfeit and the stolen checks.

3          We have another witness, Your Honor.  He is an

4  examiner for the New York State Taxation Authority and he is a

5  friend of Mr. Nagi's who has been extensively interviewed

6  because there was an allegation that Mr. Nagi was bribing him.

7  In his interview he stated that he's been in Mr. Nagi's company

8  on many occasions, that he believed Mr. Nagi to be a drug

9  trafficker because many times when Mr. Nagi was talking on the

10  phone he would make references to quantities and dollar amounts

11  and frequently leave that individual's presence.  The

12  individual also stated that Mr. Nagi had put a car in Mr.

13  Nagi's name for the individual because the individual being a

14  state employee couldn't substantiate the income from the car --

15  I'm sorry, the income to purchase the car -- and Mr. Nagi had

16  loaned him the money to purchase the car and put the car in Mr.

17  Nagi's name.

18          Finally, Your Honor, Mr. Nagi, as you can tell from

19  the personal information, resides with his wife and two

20  children.  The individual putting up the $136,000.00 worth of

21  property is his girlfriend.  So there may be a whole moral

22  suasion issue here in that he's married, lives with his wife.

23  How much concern is he going to have if he absconds with the

24  girlfriend's property?

25          So for all of these reasons -- or the factual

1   arguments other than the defendant's statement -- Mr. -- the

2   statement about what was in the affidavit were made to the

3   magistrate; the argument that this was a legitimate business

4   transaction, the argument of Mr. Yepes' affidavit.

5          So, really, the only difference you're hearing

6   besides the contradictions in the affidavit is the $136,000.00

7   and the additional suretors in a presumption case involving a

8   ten to life who is a defendant with a prior conviction who was

9   found in possession of stolen checks.  We do not believe that

10  the property of a girlfriend is sufficient to secure his

11  appearance.

12         MR. SEIDLER:  Well, I've heard everything about the

13  narcotics charge and what the government is trying to do is

14  just muddy the water and overlook the narcotics allegations

15  against this defendant.  It's those allegations for which he's

16  here and I'm not minimizing anything else, I'm not asking to

17  downplay it but the charge against him which he's forced to

18  litigate is a ten to life narcotics conspiracy charge and the

19  evidence isn't there against him.

20         THE COURT:  Well, Ms. Klapper is going to give me the

21  transcripts that she's talking about and I'll take a look at

22  that to satisfy myself on the arguments on that point.

23         What do you say to the argument about the suretor who

24  is putting up property and doesn't have sufficient moral

25  suasion?

```
 1              MR. SEIDLER:  She's in court.

 2              THE COURT:  That's not an answer.

 3              In other words, yes, she's in court but in other

 4   words, is Ms. Klapper wrong about the relationship?

 5              MR. SEIDLER:  Well, I told Ms. Klapper about the

 6   relationship.  I told her who was putting up --

 7              THE COURT:  Okay.  So now she knows about it --

 8              MR. SEIDLER:  -- I told her who is putting up the

 9   property.

10              THE COURT:  All right.  You told her --

11              MR. SEIDLER:  But she's one of --

12              THE COURT:  Excuse me.  Excuse me.  Pardon me, sir,

13   let me ask the question because you don't seem to be responding

14   to it.

15              She's saying that, okay, whoever told her about it

16   now she knows that and she's saying here's a defect or a

17   problem with having that person serve as a suretor.  What do

18   you say to that argument?

19              MR. SEIDLER:  Ms. Klapper doesn't know what the

20   personal relationship is with the defendant and his wife.  The

21   proposed suretor who has the property does not own [sic] the

22   $15,000.00 and she is one of seven.  The fact that he has a

23   girlfriend should not disqualify him for bail, Your Honor.

24              THE COURT:  It doesn't disqualify and I don't think

25   that's the argument.  So, again, I'm going to --
```

1          MR. SEIDLER:  But --

2          THE COURT:  Excuse me, sir!  Let me ask the questions

3  --

4          MR. SEIDLER:  I don't understand the point that Ms.

5  Klapper was trying to --

6          THE COURT:  I'm trying to explain it to you and if

7  you actually let me finish the question perhaps you'll

8  understand it well enough to answer it this time.

9          The proposition is that if Mr. Nagi has a wife and

10  children that he doesn't want to leave behind, perhaps the

11  suretor, who is a girlfriend, might not be somebody he is

12  unwilling to disappoint which is something that actually

13  strikes me as something to take into consideration.

14          So what is the problem with that argument?  What do

15  you say in response to it?

16          MR. SEIDLER:  It's argument but that's true in any

17  bail case where other than the immediate family are

18  guaranteeing a defendant's return.  If he has a wife and child,

19  he can run out on anybody and the argument would be, well,

20  really, he's going to be with his wife and child, what does he

21  care about the other six people?

22          THE COURT:  Yes, exactly and, frankly --

23          MR. SEIDLER:  But that's true in every case.

24          THE COURT:  No, actually, that's not true.  I rarely

25  see that circumstance where -- so that's what I'm trying to

1   figure out.  If there's something that I don't understand about

2   it, that's fine, but --

3           MR. SEIDLER:  Respectfully, Your Honor, I see all the

4   time people coming in who are not necessarily just family but

5   also friends or distant relatives or work acquaintances coming

6   in and are willing to sign for somebody.

7           THE COURT:  Yes.  Okay.  I think we're talking past

8   each other because there really is a difference between a

9   friend or a relative in addition to family and somebody whose

10  relationship with the defendant actually undermines the

11  relationship with the family.  Now, if you're saying that it

12  doesn't undermine it or that there's something I'm missing

13  about it, I'll hear you.

14          MR. SEIDLER:  If I were to tell Your Honor that I

15  have many, many clients who have a wife and a girlfriend, I

16  mean what else can I say?

17          THE COURT:  Well --

18          MR. SEIDLER:  I mean I don't think --

19          THE COURT:  That often courts -- one thing you could

20  tell me is, you know, Judge Orenstein, you've got it wrong.

21  Clients often have their girlfriends put up --

22          MR. SEIDLER:  Also --

23          THE COURT:  I don't suppose I could finish the

24  sentence.

25          MR. SEIDLER:  I'm sorry.

1      THE COURT:  I often have these clients who have both

2  a wife and a girlfriend, have the girlfriend serve as a suretor

3  in that situation?

4      MR. SEIDLER:  Well, what Mr. Nagi did remind me of

5  and actually while -- the woman who is referred to as his wife,

6  he's not legally married to either one.

7      THE COURT:  Okay.

8      MR. SEIDLER:  He has children with one.

9      THE COURT:  Right.

10      MR. SEIDLER:  No children with the other but neither

11  one of them are legally his wife.

12      THE COURT:  Okay.  All right.  Well, I'm going to

13  hold off on this until you can provide me with those

14  transcripts so we'll take this up at the second call.

15      MS. KLAPPER:  Yes, Your Honor.

16      My only concern is that I have to reach the case

17  agent.  He's in the City.

18      THE COURT:  U-hum.

19      MS. KLAPPER:  So I don't know if I'll be able to get

20  to him before 4:00 or 5:00 today.  If necessary, hopefully, we

21  can put this over but I'd like to provide you with the actual -

22  -

23      THE COURT:  No, we're going to make a decision today

24  and if you don't have transcripts to back up what you're saying

25  about it I'll take that into consideration.

1          MS. KLAPPER:  All right.  Can we have a 4:30 call

2   then, Your Honor?

3          THE COURT:  Yes.  Come back at 4:00.  Come back at

4   4:00 and let me know where we stand.

5          MS. KLAPPER:  Thank you, Your Honor.

6          Your Honor, I have line sheets which are almost

7   verbatim transcripts.  I will let you know what I have.

8          THE COURT:  Whatever you want to bring me I'll look

9   at.

10         MS. KLAPPER:  That's fine.

11         THE COURT:  But, you know, to the extent that it

12  feeds into the argument that it doesn't support what you're

13  saying, you know, you take the risk that --

14         MS. KLAPPER:  Of course.

15         THE COURT:  Okay.

16                      [Second call.]

17         THE CLERK:  Second call.  Frank Nagi, 07-CR-99.

18         Counsel, again, please state your names.

19         MS. KLAPPER:  Good afternoon, Your Honor.

20         Bonnie Klapper for the United States.

21         THE COURT:  Good afternoon.

22         MR. SEIDLER:  Alan Seidler.

23         THE COURT:  Good afternoon and welcome back, Mr.

24  Nagi.

25         All right.  So, Ms. Klapper, you've given me three

1    exhibits of line sheets from your investigation.

2              MS. KLAPPER:  Yes.

3              THE COURT:  Okay.  Mr. Seidler?

4              MS. KLAPPER:  Your Honor, may I be heard because I

5    think --

6              THE COURT:  Just make sure --

7              MS. KLAPPER:  Oh, I'm sorry.

8              THE COURT:  All right.  Go ahead.

9              MS. KLAPPER:  Yes, Your Honor.

10             Defense counsel's primary argument regarding the

11   strength of the evidence was that the conversations that were

12   intercepted related to a series of financial transactions

13   between the defendant and Hector Vidal Yepes-Casas, a source of

14   supply for heroin.

15             I have 119 pages of line sheets, Your Honor, and I've

16   selected three series of calls that I'd like to bring to your

17   attention.  I do recall now that I have these calls in front of

18   me that the first series I'm going to reference which took

19   place between January 22nd and 23rd was presented to the

20   previous magistrate who denied the bail motion.  They were

21   presented in response to the same argument that Mr. Seidler

22   made.  That magistrate found that these calls clearly did not

23   relate to business transactions and I think it may have been

24   Magistrate Pollak.

25             THE COURT:  In any event, let's assume I'm looking at

1   them --

2            MS. KLAPPER:  In any event, Your Honor --

3            THE COURT:  -- for the first time to avoid any

4   argument over whether it's the first time or not.

5            MS. KLAPPER:  -- we can always order the transcript.

6            On January 22, 2007, Your Honor, Mr. Nagi says, "You

7   are slow with me" and Mauricio, who is Hector Vidal Yepes-

8   Casas, says, "No, everything is okay.  I just did not go out

9   today."

10           THE COURT:  Can I stop you there?

11           MS. KLAPPER:  Yes.

12           THE COURT:  I see in the indictment that there is

13  somebody who is also known as Mauricio who is -- well,

14  actually, there are two Mauricios here.

15           MS. KLAPPER:  Yes.

16           THE COURT:  This is Mr. Yepes-Casas?

17           MS. KLAPPER:  Yes.

18           THE COURT:  Okay.  Go ahead.

19           MS. KLAPPER:  I know you've had an opportunity to

20  glance at these calls, Your Honor.  The first call in the

21  government's interpretation is Mr. Nagi telling Hector Vidal

22  Casas, "You're slow with me," meaning you haven't delivered me

23  anything.  Hector Vidal Yepes-Casas tells Mr. Nagi, "Leave me

24  ten pesos."  During the course of the investigation "pesos" has

25  always referred to dollars and, typically, a thousand dollars.

1   So it's the agent's interpretation that Yepes is asking Mr.

2   Nagi, give me $10,000.00 and "I'll leave the package there for

3   you later."  Subsequently, Yepes-Casas said, "I'll leave the

4   package for you there later."

5           If you look at the next call, Your Honor -- actually,

6   the second to next call.  It's also January 22nd, Page 54 or

7   119, and Nagi says to Yepes-Casas, "Everything is fine" and

8   Yepes-Casas says, "900 pesos."  It was our interpretation that

9   Nagi had only left $9,000.00 for Yepes-Casas.  Then in the

10  subsequent -- the very next conversation -- Hector Vidal Casas

11  -- Mauricio -- says to Nagi, "Help me out with the most you

12  can."  The following conversation, "Bring me whatever you have

13  because I have to do an errand now.  I'll take 15 or 10 pesos"

14  -- $15,000.00 or $10,000.00.

15          Now, Your Honor, arguably, these calls could relate

16  to money that Mr. Nagi owed Mr. Casas for the sale of the deli

17  but we turn to the very next call, Page 57 of 119, Nagi says,

18  "That thing is not good.  You have to change it."  Now, Your

19  Honor, there have been problems in this case with poor quality

20  heroin.  So it is in that context we go to the very next call

21  when Hector Vidal Yepes-Casas, on Page 58, says, "Check them

22  real well because those are the ones from the tube.  If not,

23  bring it here and I'll change it again.  You have to bring it

24  in the evening."  Nagi answers, "It isn't the same."  Yepes

25  says, "It's the same one from the same people."  Nagi insists,

1   "It isn't the same.  I'm going to check it again."  The next

2   conversation, again, there is a conversation between Nagi and

3   Yepes about checking it.

4          Your Honor, several --

5          THE COURT:  I'm sorry, you say "the next

6   conversation," you're referring to Exhibit 2?

7          MS. KLAPPER:  No, I'm sorry -- yes, Your Honor.

8   Exhibit 2.

9          THE COURT:  Okay.  But those are from two months

10  earlier; correct?

11         MS. KLAPPER:  I'm sorry, Your Honor.  We'll end with

12  Exhibit 1, January 23rd, when Nagi is insisting that "it isn't

13  the same" and I want you to pay particular attention to the

14  comment, "check them real well because those are the ones from

15  the tube."  Within several days if not a week of this

16  conversation the DEA made a seizure of heroin.   The heroin

17  from intercepted calls was destined for Yepes-Casas.   The

18  heroin was contained in tubes.  These tubes were sealed inside

19  trailer hitches.  Earlier conversations between Yepes and his

20  source of supply in Colombia had indicated that heroin was

21  being sent to Yepes inside tubes in trailer hitches.  These

22  conversations took place both before the Nagi conversation and

23  after the Nagi conversation.

24         So with regard to Exhibit 1 we would submit that this

25  is not a conversation relating to money owed for a bodega but

1   it is a conversation in which Nagi is telling Yepes-Casas, I'm

2   not happy with the quality of the heroin.

3          Regarding Exhibit 2, Your Honor, Exhibit 2 is an

4   earlier conversation that took place in 2006.  In that

5   conversation we see similar language to the 2007 call.  Nagi

6   asks Yepes-Casas, "Are we going to meet tomorrow?"  Yepes-Casas

7   said yes and Nagi says, "Let me know in the morning that you

8   checked that very well."  Yepes says, "Yes, check that

9   everything is all right."  It's the government's position that,

10  again, this is a discussion about the quality of the heroin.

11         Your Honor, also as part of Exhibit 2 was a

12  conversation dated January 15, 2007.  Yepes-Casas tells Nagi,

13  "I'm doing that around here.  I'm picking it up from my friend.

14  I'm picking up.  I'm meeting my friend" and Nagi responds,

15  "Later on."  "Don't worry," this is Yepes-Casas, "I'm working

16  on that.  I'll call you later on."  Again, this does not seem

17  to be a conversation related to Nagi owing Yepes-Casas money.

18  The next day there is a conversation on January 16th between

19  Yepes-Casas and Frank Nagi.  Yepes-Casas says, "I got a little

20  thing for you but I need the money for tonight.  I'm going to

21  leave it at the bodega and you'll give me the money tonight."

22  Again, Your Honor, this is clearly an exchange between Yepes-

23  Casas and Nagi, not simply Nagi owing Yepes-Casas money.

24         Exhibit 3, Your Honor, dated October 5, 2006.  Nagi

25  asks -- now, this is Nagi asking Yepes-Casas but counsel states

1   that Nagi owes Yepes-Casas money.  This is Nagi saying:

2           "NAGI:  Do you have something?

3           "YEPES:  I don't have anything.  What happened to

4   what they were going to give you?

5           "NAGI:  I don't know.  You told me you did not want

6   to see it.

7           "YEPES:  Ask for a sample."

8           Again, typical language regarding a sample or heroin.

9           I should tell Your Honor that we did seize over

10  twenty kilograms of heroin in this case and we intercepted

11  conversations relating to the importation of a far greater

12  amount of heroin.

13          Finally, Your Honor, what I have is Exhibit 4 which

14  I'm going to hand up to Your Honor now.  We offered this to

15  rebut the argument that Nagi is simply paying Yepes-Casas

16  money.  In this conversation Yepes-Casas says, "I am by Queens"

17  and Nagi says, "Bring me a check for $1,000.00."  Previously

18  intercepted conversations with other customers showed that

19  "dollars" as often a reference to brand so in this conversation

20  it's Nagi asking Yepes-Casas for money.

21          These, Your Honor, are only several of 119 pages of

22  line sheets.

23          THE COURT:  All right.  Mr. Seidler.

24          MR. SEIDLER:  No. 1, there was nothing seized from

25  the defendant, no narcotics, nothing.  When the government says

1   that "pesos" refers to money, Spanish people commonly refer to

2   dollars as pesos in back and forth --

3           THE COURT:  Let me ask you a question because the

4   government has to make inferences, you have your client here,

5   he can tell us what these conversations mean so what does he

6   say they mean?

7           MR. SEIDLER:  They're about a shareholders agreement,

8   they're about notes.  When he talks about, "I have to check

9   with my friends," there were four people who were members of a

10  shareholders group that purchased the delicatessen, there was a

11  car that was purchased.  When the government refers to a

12  "tube," I listened to that conversation after we came to court

13  the last time.  It doesn't say "tube," it says "two."

14          THE COURT:  It says "two."  So let me just see.  The

15  conversation is in Spanish or in English?

16          MS. KLAPPER:  It's in Spanish, Your Honor.

17          MR. SEIDLER:  Spanish.

18          THE COURT:  So what's the Spanish word for "tube"?

19  In other words, I can understand --

20          MS. KLAPPER:  I don't have the language here with me,

21  Your Honor.

22          THE COURT:  Which conversation was this?  Okay.

23          MS. KLAPPER:  This is Exhibit 1, Your Honor.

24          THE COURT:  "Check them real well because those are

25  the ones from the two" in your version.  Okay.  So what does

1  that mean?

2         MR. SEIDLER:  These people -- Your Honor, they were

3  dealing -- they were engaged in commerce involving automobiles.

4  They were involved in commerce involving a grocery store.  I

5  have shareholders agreements, I have bills of sales involving

6  cars.  My point is that this is all in dispute.  He's in jail.

7  I don't think he should be in jail while --

8         THE COURT:  I know you don't.  You wouldn't be here

9  obviously otherwise.  I'm trying to get -- to the extent you're

10 making an argument based on the strength of the government's

11 case, I'm just trying to get your sense of what these

12 conversations mean if not what the government says they mean.

13        MR. SEIDLER:  They mean that there was commerce.  Mr.

14 Nagi was purchasing cars and the government has seized

15 documents reflecting this.  Seized purchasing cars from Yepes-

16 Casas.  He bought a delicatessen.  There were bounced checks on

17 the part of Mr. Nagi, there was money owing, there were bounced

18 checks that Mr. Yepes-Casas had that were being returned to Mr.

19 Nagi.  The government seized bounced checks from Mr. Nagi that

20 were returned from Mr. Yepes-Casas.  They were talking about

21 commercial matters.  They were not talking about drugs.

22        The government can say they've seized 20,000 or 20

23 kilograms, well, maybe they have but they seized nothing from

24 him.  Absolutely --

25        THE COURT:  Okay.  Are you suggesting that absent a

1    seizure of drugs from your client, himself, I shouldn't or

2    wouldn't properly detain him or --

3        MR. SEIDLER:  No, what I'm saying is if the

4    government stands up here and waives 20 kilograms, we seized 20

5    kilograms and, therefore, he must have been involved in a

6    narcotics transaction.

7        THE COURT:  I don't think -- are you saying that?

8        MS. KLAPPER:  No, Your Honor.  I wanted --

9        THE COURT:  Okay.  You're not saying that.  Go on.

10   She's not saying that.  So what else?

11       MR. SEIDLER:  What I'm saying is that the

12   government's evidence against this defendant is based on their

13   interpretation of some phone calls.  What I am presenting to

14   the Court is otherwise innocent explanations for these phone

15   calls.

16       In connection with the bail hearing what I am saying

17   is that there is a reason based on the strength of the

18   government's case, based on his background, based on the bail

19   package presented why he should not be detained while this is

20   going on and while people are being extradited from other

21   countries to face these charges and Yepes-Casas, against his

22   own penal interest, has given an affidavit saying that he

23   wasn't involved.

24       THE COURT:  Well, again, just to remind you I've

25   already ruled on that.  Unless you're going to give me evidence

1  that after consulting with counsel he adheres to that

2  statement, I'm not prepared to rely on the affidavit.

3           MR. SEIDLER:  Well, it's a sworn statement.

4           THE COURT:  I understand and I've given you my ruling

5  on that.  Just so if you want to frame your argument without

6  reference to that, go ahead, but I'm not taking that into

7  consideration.  I don't find it sufficiently reliable under the

8  circumstances where it was done without counsel and counsel has

9  told you now not to have any further communication between

10  them, it just raises a question in my mind as to whether it's

11  reliable.  So I'm not going to take it into account on the

12  present record and you can frame the rest of your argument

13  without reference to it.

14           MR. SEIDLER:  Your Honor, the government has to

15  convince people that these are conversations involving drugs.

16  There was talk -- I'm giving the Court a reason why there was

17  talk between the people.  I'm giving the Court reasons why

18  amounts were being discussed between the people.  I'm giving

19  the Court reasons why this defendant on behalf of a group was

20  talking to Yepes-Casas because they're the only people who

21  speak Spanish.

22           Even assuming that they were involved in illegal

23  conduct involving checks, there's no presumption that he should

24  be held in jail for commerce involving stolen checks if that's

25  what the government is alleging.  As far as the narcotics

32

1   transaction, this is not evidence of a narcotics transaction.

2   When you take conversations where no narcotics are mentioned

3   and you take the fact that there were no seizures made, just

4   because Yepes-Casas was involved in narcotics activity and this

5   defendant was talking to him on the telephone, that doesn't

6   make him involved in narcotics activity.

7           I'm asking Your Honor to set bail in this case.

8           THE COURT:  All right.  Anything further?

9           MS. KLAPPER:  No, Your Honor.

10          THE COURT:  All right.  I'm denying the bail

11  application.  I find that on the record presented to me there

12  is no condition or combination of conditions that will assure

13  the defendant's appearance as required or the safety of the

14  community.

15          With respect to the strength of the case I am

16  persuaded that the line sheets representing recorded

17  conversation create a strong case that bolster the presumption

18  rather than undermine it notwithstanding the arguments that

19  counsel has made.

20          I do have concern about the propriety of the suretor

21  who is proposing to post property in light of all of the

22  circumstances.  That's not the primary basis for it but I do

23  think that overall the package does not overcome the

24  presumption and, therefore, I'm denying the application.

25          Anything else?

1          MS. KLAPPER:   Your Honor, I'm going to ask that

2    Exhibits 1, 2, 3 and 4 be made part of the file and be filed

3    electronically so that if there's another bail hearing then

4    they will be part of the record?

5          THE COURT:  All right.  Any objection to that?

6          MR. SEIDLER:  No.  For whatever -- no.  I mean

7    they're being offered today as exhibits that were presented

8    today?

9          THE COURT:  Well, they were presented to me for

10   purposes of refuting the arguments that you made to me that you

11   said was being made for the first time so I took it at face

12   value and considered these as being made for the first time --

13   I did -- but without meaning to resolve what was presented

14   before.

15          All right.  Anything else, folks?

16          MS. KLAPPER:  No, Your Honor.

17          THE COURT:  All right.  Thank you all.

18                         *  *  *  *  *

19

20

21

22

23

24

25

34

* * * * *

I certify that the foregoing is a transcript from an electronic sound recording of the proceedings in the above-entitled matter.

_____

CARLA NUTTER

Dated:   June 4, 2007